Good afternoon. We will be hearing this case by Zoom for the attorneys for the appellant plaintiffs and also Judges Nguyen and Hawkins will be hearing the case by Zoom. So, I'll call the case now and I'll be the presiding judge for the purposes of this courtroom. The case is Finjan Holdings, Inc., Securities Litigation v. Finjan Holdings, Inc., No. 21-16702. Mr. Grier, Mr. Bonteverde, you're appearing for Mr. Grier, right? That's correct. All right. You may commence. You have 15 minutes. If you're going to save any time for rebuttal, you'll have to watch the clock yourself. We won't be able to help you on that. Okay. Well, my plan is to reserve two minutes, but I will try to keep track of the time. All right. Go ahead. Good afternoon. Juan Bonteverde with Bonteverde & Associates for the plaintiff appellant. Today, we're asking this court to reverse dismissal of the lower court for the simple reason that plaintiff did plead in his complaint, subjective falsity, challenging the statements and the projections themselves, as well as the analysis and the recommendation statement used to sell Finjan, as well as pleading motive against its CEO, Finjan's CEO, to slash the projections. Now, these projections, they were shown to the market originally in December 2019, and they show 200 to 400 million of revenues for four years, up to four-year period. And then in May 2020, the projections now are slashed by almost half from the midpoint to 166 million, and the period is expanded to five years. Mr. Bonteverde, did something happen between the projections in 2019 and the time of the sale in July of 2020? Something called COVID? Yeah, and I agree, it did happen, but those are the words that we have to focus in. COVID is where defendants are seeking refuge, but they actually said it was not a problem for us, Finjan. In fact, those are their words, it's not us. If you look at the statements that they made in the earnings call, they're actually saying, we're not worried about it. In fact, they actually say much of the outstanding case updated has remained largely unimpacted, notably seven cases and upcoming trials, and that their patents are stronger than ever. And this is litigation, so the worst that COVID was going to do for them was going to extend when they can get to trial. But what they do to the projections is they slash them, they remove revenues, and there is no reason for that. And in fact, if you look at the statements in the market, it doesn't support it. And if you look at that 14 and nine itself, there's references seven times to COVID, but really to justify selling the company for what's a low price because the stock was down. Nowhere in the D9, the 14 and nine, there's any explanation we're now going to change our projections because of COVID. And that's on the record, pages 62, 63, where the projections are described. And that's defendant's problems. Defendant's problems is now seeking refuge. They signed seven times in the 14 and nine that were COVID. And they say, oh, that's why we did it. Well, you didn't say that in the 14 and nine. And that supports our pleading subjective falsity. Because if they had a reason to justify changing the projections, which sometimes that happens, you would imagine it would say that in the recommendation statement. And I think that's what the court needs to focus here today is what the defendants say at the time. And the elephant in the room is not COVID. The elephant in the room is what happened to the revenues? They disappeared. They were decimated and without any reason whatsoever. And they needed the projections lower because they couldn't justify a sale because they wanted to get a fairness opinion. And they use Atlas. How do you address really the market forces at play here? 50 entities were solicited for bids and ultimately ended up with two offers around the same final price. And they took the better of the two offers, right? How do you deal with that? Yeah. And I think that's a common fallacy, Your Honor, in M&A, in mergers. Just because you put yourself up for sale doesn't mean you're going to be sold at a fair price. Sometimes you don't sell. And that's a lot of these cases that have been litigated in Delaware Chantry Court. That's what the judges say. If it's the wrong time to sell, which in the middle of COVID, at the beginning of COVID, was probably a wrong time to sell. You don't sell. But why did this happen? And I think that goes for motive. Let's look at the timing. Well, counsel, that may be the case. But what happened in the real world, in terms of the solicitation of the bid and the sale process, is a pretty strong indicator that COVID-19 had a substantial negative effect on revenue projections, right? There's an interrelationship there. You can't just separate the two. Well, you're right, except that they, the defendants, said COVID is not affecting us. They are saying it's going to affect all businesses. They say that in their transcript at 225. But if you continue reading on 226, as well as 229, they talk about how their wealth position, their patents are stronger than ever. And still, delaying trials is not going to remove revenues, which is what they did. So it's not that, could you justify it? It's that the defendants themselves said, it's not a problem. And that timing matters. Because by the way, and it's in our complaint, the first offer from party B was $1.86 before COVID in February 2019. They were always in that sort of price. And Fortress was a lot higher. Fortress went away in December of 2019. And then the only one standing was party B, who was critical of management in January and February. And early March, the CEO says, we're not selling. We're going to stop. And then on April 1st, party B comes back and says, we want to buy you and we're going to buy you on the open market. We're going to launch a hostile takeover, but we're also offering you $1.50 a share. The CEO runs to Fortress, calls them to see if he can probably get a deal at a little bit higher than what party B is offering because he wants to keep his job. He knows party B is going to fire him. And then he ends up selling to Fortress. And this whole notion that, well, party B had a standstill, that's defendant's argument. First of all, if you look at the 40D9 on ER44 and 45, you'll see that party B had already signed a standstill back in October, November 2019. So there was no... Council, excuse me. What per share price did FinJAM management project ultimately would occur? Are you discussing the liquidation analysis? No, no. They were projecting what the per share price would be on an open market. What did they project? Well, the analysis from their bankers, Atlas, if that's what you're asking me, they projected 162 to 163 under one analysis. I thought it was 155. That's what they received. That's not what they received. That was the offer. 155 was the offer. But that's a good point, Your Honor. Their asset value at the time was $1.66 book value. So they sold for below book value. They sold to Fortress because party B was coming very aggressive and Mr. Harstein knew party B would get rid of him. And he knew he could get a job with Fortress. In fact, he did get a job and he still has that job. That's why we have pled motive. And let me remind you, this is a motion to dismiss and we have pled all the allegations necessary. And we have a number of cases where you have projections change improperly and they survive a motion to dismiss. I think the lower court, one of the examples that exemplifies how the lower court bend it over backwards was to say, well, when party B says they don't like management, management could be anyone. It could be Perkins Coy, the outside lawyers for Fingen, could be the transaction committee. No, that's not what it is. Management is the CEO. And in fact, you don't have to take my word because at ER62 on the 14 and 9, the company discusses how it prepared projections and it then provided them to the board. Well, if the board was not management or the board was management, it wouldn't be preparing things for themselves and self-providing them. Also, are you suggesting that at the end of the day, party B was willing to sell for more than what Fortress was willing to sell? I thought party B was not willing to do it. And that hopefully the price offered by Fortress was better. A hundred percent. It was better. Party B was aggressive. They were trying to accumulate shares because they knew the company was at a low point and it had a lot of potential. And the CEO got scared and went to Fortress because they could keep the job there. And I think we're trying to focus. At the end of the day, how much was party B willing to pay? 150. That's what we know. And Fortress was willing to pay 155. And I think what you're really saying is the plaintiff may have a hard time proving a trial damages, but there is other ways to prove damages in a sales process, like intrinsic value. What we're saying today is, and that's the focus, is there a misleading statement? Yes, there is. We've caught them. We caught them with a revenue of 400 million and they changed it without any basis. And COVID now is used as an excuse, but you have to go back and look at the time what they were saying about COVID. And they said, we are fine. Those are the facts. And we've bled facts based on what the defendant said. This is not us saying, oh, COVID wasn't a big deal. They said that. So the idea that they were not sold for, or they were sold for what others were willing to pay, doesn't mean that there was no misleading statement. I think that's what we need to be focused in. So by the way. So counsel, what you're saying is that once a client B pulled out of it and said they wanted to buy assets, they didn't want to buy shares. And the only offer was from Fortress at 150, that the only reasonable alternative, which Finjan should have followed was not to sell at all. A hundred percent. And they said we have a lot of cash on hand and we can survive the next, up to the next four quarters or beyond. Well, couldn't the shareholders have said, all right, we don't want to sell at all. The thing with shareholders generally, and that's why management is important. They will follow management's recommendations. And when management puts a recommendation that this is a fair deal, it's not crazy to think that the shareholders are not going to are fiduciaries of their own. And one way fiduciaries protect themselves is by following advice of management. I mean, what we're really arguing now is the market price properly priced. And when you essentially mislead the market and you retract your projections, you're essentially injecting information in the marketplace that it's inaccurate. And that's what this case is about. We caught them and it's their words. They said, we are going to make 400 million in 2019, late 2019. They don't say we're changing those projections because of COVID. In fact, they say we still expect our patents to do well. And then they change the projections and why they change the projections, because they need a fairness opinion. I think it's a pretty simple case with all the respect. And their asset value, again, that's their valuation. It's $1.66. So they sold for less than their assets are worth. This is on the record on ER 102, 109 through 11, and 123 through 24, where we show other valuations that the market was providing for FinGen. And that's what we're here for today. Are we, did we plead sufficient facts to support subjective falsity? That is that the CEO did not believe. Is there any indication that if the sale had not gone through the fortress management would have been displaced? Yes. If party B acquired them, that's on ER 108 and 121 and 122, that party B had its own management. And that's a strategic bidder. Strategic bidders, when they value normal, they've displaced management. That's common. But here they had also expressed criticisms to management. On the other hand, when a company sells to a private equity like fortress, they are not in the business of running businesses. They're in the business of buying businesses and letting management continue the day-to-day operations. We've pledged sufficient facts at this stage to show that the management did not believe the changes to the projections were appropriate. You have about one minute left. Do you want to keep that for rebuttal? Yeah, I'll keep it for rebuttal. Thank you very much. Mr. Jacobs? Thank you, Your Honor. Good afternoon. I'm James Jacobs on behalf of the defendants and respondents. I first would like to acknowledge and thank the court and staff and opposing counsel for graciously agreeing to continue this hearing when my prior medical emergency arose. I just wanted to thank the court for that. So plaintiff's allegations of both subjective and objective falsity are founded on the difference between the optimistic or more optimistic revenue projections by FinGen management in December 2019 and more pessimistic projections, the fairness opinion projections created by management and financial advisor Atlas in June 2020. To avoid the elephant in the room of the intervening months, and it is an elephant in the room, and the elephant is COVID-19, the pandemic that caused market volatility and prolonged court closures. Plaintiff has strung together a fanciful story of a CEO, Mr. Hartstein, who, despite standing to gain far more if fired by Part B, instead rigged the negotiations to favor a purportedly below market value bid from Fortress that would ultimately set the price for his own FinGen equity. Well, Mr. Monteverde, they pointed out that there were statements made by management, even after COVID was recognized throughout the country, that the epidemic or the pandemic would not have any adverse effect on revenues. Correct? I don't know that there is not an affirmative statement that I'm aware of that COVID would not have an impact on revenues. In fact, there are disclosures and statements that FinGen would not be immune to COVID, that COVID-19 increased its operating costs and cash expenditures and interfered with its revenue stream. That's an ER51. And so, no, the management did not make those statements. And I want to comment on the statement that the valuation of COVID that counsel spoke to- there were, in fact, affirmative statements that COVID would have no effect on the revenue projections of the company. Would that make any difference? If there were affirmative statements that were not qualified statements or just vague optimistic statements about the state of the business generally, that the patents are strong, that is not a statement that COVID is not going to impact the fundamentals of your business or your future prospects or your future revenues. And in fact, what was disclosed is that trials were being delayed. FinGen's business model is dependent upon being able to litigate when necessary. And with the onset of COVID, it became clear that they were- FinGen was now looking at delays of up to 18 months for certain of its trials. And these delays and how long they would ultimately last were, at that point in time, only speculative. Nobody knew how long the courts would be closed, how long jury trials would be impacted, and things changed with time. And so the trial delays would clearly impact FinGen's ability to obtain revenues that it previously, back in December, had forecasted that were included in its forecast. In spinning this theory that Mr. Hartstein would have more to gain by subterfuging a transaction with Party B, the plaintiff relies not only on the fairness opinion projections referenced in the recommendation statement, but on the detailed sequence of events also in the statement regarding FinGen's strategic process dating back to 2018. And the district court and this court have the ability to look at the totality of these events as described in the recommendation statement under the incorporation by reference doctrine, not to resolve disputed issues of fact, but to view the plaintiff's story in the full context of the very materials he relies on the most. Now, some of the inconvenient facts the plaintiff would have the court ignore include that Mr. Hartstein was not on the two-member transition committee authorized by the board to oversee the sales process. It was staffed by two independent directors. And as the court has already noted, Atlas approached more than 50 parties about a transaction with FinGen. Eleven entered into NDAs. Ultimately, only Fortress and Party B expressed interest. Mr. Jacobs, who appointed the two members on the committee? The board of directors appointed— Not Ms. Hartstein. No. And by the—ultimately, only Fortress and Party B maintained interest. And by the end, only Fortress pursued a merger transaction. Party B never made a topping bid, a superior bid, or even an equal bid to that which Fortress made. In March 2020, the shelter-in-place orders closed courts across the country. The stock market became incredibly volatile. The court declared a mistrial in FinGen's case against ESET due to COVID, and then FinGen faced delays of up to 18 months in its litigation timeline. COVID increased its operating costs, its cash expenditures, and then management performed a liquidation value analysis in April of 2020 and concluded that the shares were worth approximately 70 cents per share, less than half the merger consideration. But didn't the fair market price go to 162, 163? At what point in time, Your Honor? Sometime before the sale. There was a fair market price of 162, 163. I think what Your Honor might be referring to is that there were multiple valuation analyses performed by the financial advisor. Right. And one of those—so the most common and recognized as the most important and most useful is the DCF analysis, the discounted cash flow analysis, which came back with a range of prices of $1.27 to $1.68, and then another range of $1.42 to $1.55, and the ultimate price was $1.55. There was a selected—there was another valuation called a selected public company trading multiples analysis that had an implied per share range of $1.62 to $1.63, but the limitations of this approach are actually disclosed at ER59. This is—so there was an alternative valuation, but it's not the one that is primarily relied upon in the industry. And then the statements—by late in April of—April 13, Fingen gave Part E.B. a week of exclusivity for negotiations after plaintiff alleges Mr. Part E.B. By late April, Part E.B. declined a transaction at $1.50 per share and proposed restructuring to—for it to be an asset purchase rather than a merger. The May 20 statements by Mr. Hartstein in Fingen earnings call to which plaintiffs points also contain repeated statements about the impact that COVID-19 was having on Fingen and its operations. That starts at the supplemental excerpt of record at page 225. And, for example, one of the statements that was discussed was the discussion of cash, and counsel said that Fingen— Let me ask you this. When was the first mention by management that COVID was having an effect on revenues? It would have—I believe it's in the month of May. May of what year? Of 2020. At that point in time, there was the call with—conference call and the issuance of a 10-Q.  Sale was done in June. As of June, Fingen had recorded zero revenue in five of the last eight quarters. Fortress was the only potential acquirer standing after the Fingen board concluded that the potential drawbacks and complications of an asset purchase structure with Part E.B. would not be in the best interest of stockholders. Fortress, and only Fortress, was willing to proceed with the merger. So it's not surprising that the district court correctly found that plaintiff failed to plead facts supporting a strong inference that defendants did not believe that the $166 million financial projection for 2020— But the district court applied a fraud-scienter standard rather than a negligence standard, correct? The district court did not apply a—the district court discussed an analysis in the fraud context, but it did not do—its analysis did not require a finding of scienter. I thought the district court did just that. It read the Private Securities Litigation Reform Act and section—and Civil Procedure Rule No. 9 to require scienter. Well, it required—9B—it said that the claim sounded in fraud, so that 9B does apply, and it also read the PSLRA and said that this was a state-of-mind requirement, so facts— That sounds pretty much like scienter requirement to me. Well, but it was illustrative. There was not a technical scienter requirement, but it was— You would agree that this record would be wrong, be an error, if it applied a scienter requirement under 14E? Well, under 14E, a claim can be grounded in negligence or in fraud. But the plaintiffs here— A requirement that it be in fraud with a scienter requirement would be erroneous interpretation of 14E, correct? I agree, Your Honor. That's Varovagian—I can never pronounce it correctly—Varovagian. Okay. You've answered my question. Okay. So subjective—so we believe the Court correctly found that the plaintiff failed to plead facts supporting a strong inference that the defendants— What kind of an allegation would be adequate to allege subjective falsity, keeping in mind that you have to allege specific facts? Well, if there was, for example, a confidential informant who—a alleging that there was actual intent to make a false projection, that the projections made were believed to be false when made and were not based upon any reasonable basis. All right. But no—so the—despite the district's court's focus on subjective falsity and plaintiff's efforts to blend subjective and objective falsity together, this Court need only turn its attention to objective falsity to see the plaintiff's theory here holds no water. Contrary to plaintiff's contentions that there were no meaningful changes to Fingen's prospects the first six months of 2020, this was clearly not the case. Given— Excuse me, Your Honor. For objective falsity, there needs to be facts pled which demonstrate that the actual statement that there's an actual misstatement. And here, all that matters is whether or not the forecasts in June were inaccurate, were false. There is no evidence pled with particularity that supports the statement that the December forecasts were not correct. And it defies common sense to assume that in light of COVID, court closures, continuances of cases, that Fingen's projections would not change. The Court can affirm on the alternative ground that facts were not pled to substantiate objective falsity in addition to subject falsity. Thank you very much. Your time is up. Mr. Monteverde? Yes, thank you. I would urge this Court to please look at our complaint, paragraph 64. It's on the record, ER 105. We put a chart that defendants prepared that shows how much the trials might be delayed. The worst trial was delayed was the 14-8 to early 2024. That's still within the projected time period. It doesn't make sense to then remove revenues because all the projected revenues would still happen by 2024. I would also encourage this Court to read the May 13, 2020 earnings transcript, in particular page ER 225 and ER 226. There is no evidence whatsoever that any changes to the projections were due to COVID. In fact, there's no mention whatsoever that the revenues need to be changed. There is discussion of COVID. The management says COVID, and I will read this quickly, is impacting every business in one way or another, and Fingen is not immune. It goes on to say, fortunately for us, we have a business model that affords us quite a bit of flexibility to work remotely. And then it goes to say, since our last call in early March, during the early days of the pandemic, much of the outstanding case updates have remained largely unimpacted. And it goes on to say, our patents remain as strong as ever. And in addition, we still anticipate Rapid 7 and SonicWall trial to occur in the first half of 2021. We are not speculating. We are using defendants' words to prove subjective falsity. That suffices today. And, Your Honor, whether you apply negligence or whether you apply subjective falsity, which Fredio's decision from the Second Circuit is on point, it's not scienter. We can all agree on that. But here, we certainly have strong inference of subjective falsity. Let me ask you a last question, which I should have asked you earlier. Did you request leave to amend? We amend. This was the Second Amendment, and we were granted. No, I mean, before the court dismissed your complaint, did you request for another opportunity to amend? I believe it was in our brief, but it was denied. All right, thank you very much. All right, we've exhausted the time. And the case of Fingen-Holdings Securities Litigation v. Fingen-Holdings, Inc. is submitted. And the court will stand in recess. And that's the end of our session for the day. Thank you very much. Well, thank you, everyone.
judges: HAWKINS, BEA, NGUYEN